RECEIVED

OCT - 3 2014

AT 8:30_____M
WILLIAM T. WALSH CLERK

**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| WASHINGTON ALBERTO DELGADO DE LA VERA, | : |
| Petitioner, | : |
| v. | : |
| SONIA PIEDAD HOLGUIN, | : |
| Respondent. | : |

Civil Action No. 14-4372(MAS)(TJB)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

This matter comes before the Court by way of petition (the "Petition") by Petitioner Washington Alberto Delgado De La Vera ("Petitioner") for the return of his two minor children to Spain pursuant to the Hague Convention on Civil Aspects of International Child Abduction (the "Convention"), implemented through the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.* The Court held an evidentiary hearing on September 15 and 16, 2014. Having heard testimony and reviewed the relevant submissions, the Court now makes the following findings of fact[1] and conclusions of law pursuant to Rule 52 of the Federal

---

[1] Much of the evidence presented to the Court upon which it must make its determination was the testimony of Petitioner and Respondent, which conflicted at times. In evaluating the testimony, the Court undertook an individualized credibility assessment of each witness and assigned the appropriate weight to the testimony based on the Court's conclusions with respect to credibility. In assessing the credibility of each witness, the Court has taken into consideration "how well each witness was able to recall and describe the things testified to, the manner of the witness while testifying, whether the witness had an interest in the outcome of the case or any bias or prejudice concerning any party or matter involved in the case, how reasonable the witness' testimony was considered in light of all the evidence in the case, and whether the witness' testimony was contradicted by what that witness had said or done at another time, by the testimony of other witnesses, or by other evidence." *Sasson v. Sasson*, 327 F. Supp. 2d 489, 492 n.2 (D.N.J. 2004)

Rules of Civil Procedure. For the reasons set forth below, the Petition is granted to the extent it seeks an order that Respondent return the parties' children to Spain.

## I.    FINDINGS OF FACT[2]

Petitioner is a Spanish citizen currently residing in Zaragoza, Spain, and is the father of two minor children, K.H. and G.H.[3] Respondent Sonia Piedad Holguin ("Respondent"), the mother of K.H. and G.H., is a Spanish citizen currently living in Trenton, New Jersey, with K.H. and G.H. Both Petitioner and Respondent were born in Ecuador, where they met and began dating in 1997. Several months after they began dating, the parties moved in together in Ecuador, and in April 1999, the parties' first child, K.H., was born in Ecuador. (Transcript of Evidentiary Hearing of September 15, 2014 ("Tr. I") 11:24-12:20; Transcript of Evidentiary Hearing of September 16, 2014 ("Tr. II") 2:10-3:24.)

In or around fall 2001, the parties moved with K.H. to Zaragoza, Spain, with Petitioner moving to Spain first, followed by Respondent and K.H. approximately three months later. The parties' second child, G.H., was born in September 2002 in Spain. In 2003, Petitioner bought a three bedroom apartment in Zaragoza, Spain, where the parties resided with their two children, Petitioner's mother, and family dog, Dutchie. Although Petitioner and Respondent never married, the parties lived together with their two children as a familial unit in Zaragoza, Spain, from fall 2001 until July 2012. (Tr. 1 13:14-15:11; Tr. 2 4:16-5:19.)

---

(internal citations omitted); *Silvestri v. Oliva*, 403 F. Supp. 2d 378, 380 n.2 (D.N.J. 2005). In general, unless otherwise noted, the Court found Petitioner to be the more credible witness and credited his testimony over that of Respondent.

[2] To the extent any findings of fact are more appropriately categorized as conclusions of law, and vice versa, they are adopted as such.

[3] To protect the children's identity, pursuant to Rule 5.2 of the Federal Rules of Civil Procedure, the Court will not state their names or dates of birth and refers to them in this Opinion by their initials.

K.H. lived eleven years of her life, and G.H. lived ten years of her life, in Zaragoza, Spain. While living in Spain, K.H. and G.H. both attended and excelled in school. Both children had close relationships with their extended family, who also lived in Zaragoza, including their grandmother and cousins. Both children had many friends in Spain and participated in extracurricular activities. K.H. participated in karate and took guitar lessons. G.H. participated in karate and took English lessons. Both children regularly saw a pediatrician, dentist, and eye doctor. Petitioner has been employed as a bus driver for over ten years in Spain. Respondent was primarily a stay at home parent who worked for a few months at a time through job placements by a staffing agency. (Tr. 1 14:14-24:6; Tr. 2 63:8-64:8, 105:8-16.)

In July 2012, Respondent was unemployed and traveled to the United States through a visa-waiver, which permitted her to stay in the United States for ninety days, to find short-term work. Respondent purchased a round trip ticket to Orlando, Florida, arriving July 13, 2012 and with a return flight scheduled for October 5, 2012. Respondent left many of her personal items and effects in Zaragoza when she departed for the United States. Shortly after arriving in the United States, Respondent traveled to Trenton, New Jersey, where she knew classmates from Ecuador, and rented a room. (Tr. 1 25:20-28:12; Tr. 2 18:14-23:4.)

From July 13, 2012, through September 14, 2012, the children resided with Petitioner at the family residence in Zaragoza. During that time period, Respondent stayed in communication with Petitioner and the children. In September 2012, Respondent suggested to Petitioner that the children travel to the United States. The children traveled to the United States, arriving in Philadelphia on September 14, 2014, bringing along clothing, school records, immunization records, photographs, karate medals, and K.H.'s guitar. The children left many of their personal

3

items and effects in Zaragoza when they departed for the United States. The children's return flight was scheduled for October 14, 2012. (Tr. 1 28:13-32:7; Tr. 2 26:4-28:21.)

Petitioner testified that the children's trip to the United States was only supposed to be for one month, during which time they would visit their paternal grandfather and then travel back to Spain with Respondent. Petitioner stated that the children brought the guitar, photographs, and medals to "show their grandfather and to leave some of those things with him as a memento." (Tr. I 30:7-8.) Additionally, Petitioner testified that he sent the children to the United States with their school and immunization records because Respondent told him "that all those documents were necessary so that you could move around the United States freely. So that if the police were to stop them by showing those documents, she could be supported by those documents." (*Id.* at 42:3-7.)

In contrast, Respondent testified that she suggested to Petitioner that the children travel to the United States to live with her and attend school in the United States, but Petitioner said no. Respondent stated then suddenly one day Petitioner called her and told her the children would be arriving in the United States that same week and for Respondent to find out the documents needed for the children to begin school when they arrived. As to the length of the children's stay in the United States, Respondent's testimony was inconsistent. First, Respondent testified that she and Petitioner discussed the possibility of the entire family relocating to the United States, including Petitioner and "the girls would come and then see if they would adapt here. If they didn't get adapted to this place, then we would return." (Tr. II 26:8-10.) Later Respondent, however, insisted that Petitioner "knew from the very beginning that the girls were not going to return to Spain" and that Petitioner was also going to move to the United States permanently. (*Id.* at 74:20-21, 77:4-6.)

4

While the Court does not find either party's testimony fully credible, the Court finds Petitioner initially agreed to allow the children to stay abroad for an indefinite duration to attend school in the United States. Petitioner sent the children to the United States at the beginning of the school year with their school records. Prior to leaving Spain, Petitioner did not send the children to the first few days of their school year in Spain. The Court, however, finds incredible Respondent's testimony that both parties agreed, before the children arrived in the United States, that the children were not going to return to Spain and that Petitioner would also relocate to the United States. Petitioner never made any plans for himself to relocate to the United States or took any actions consistent with a person relocating himself or his family to another country. Petitioner remained working at his long-time job, did not sell the family residence, did not send any personal items or effects that remained at the family residence to the United States, and expressed to Respondent how much he missed her and wanted her to return to Spain sooner than she originally planned. (Tr. II 24:17-21.) These are not the actions of a person whose plan was to permanently move their family to another country.

It was not until October 2012 that Respondent advised Petitioner she was ending her relationship with Petitioner for a new man in the United States and that the children would not be returning to Spain. Petitioner did not consent to Respondent keeping the children in the United States and began to make arrangements to travel to the United States to bring the children back to Spain. (Tr. 1 30:23-31:15; Tr. 2 33:13-34:25.) Petitioner arrived in the United States on November 8, 2012. Petitioner acknowledged that he had intended to take the children on a trip to visit their paternal grandfather in Massachusetts and then bring the children back to Spain. Respondent consented to the trip to Massachusetts, not knowing Petitioner's ultimate plan, and provided Petitioner the children's passports for the trip to Massachusetts. Once the children were in

5

Petitioner's custody, Respondent learned of Petitioner's intention to return to Spain with the children and alerted the local authorities in Trenton. Petitioner ultimately returned the children back to the custody of Respondent pursuant to a court order for temporary custody obtained by Respondent from the New Jersey Superior Court. (Tr. 1 31:18-36:10Tr. 2 35:2-38:10.)

On December 8, 2012, Petitioner returned to Spain without the children because he was required to return to work. (Tr. 1 36:11-14.) At the airport in Madrid, Petitioner went to the National Police Department to report that Respondent was keeping his children in the United States without his consent. Petitioner testified that the National Police Department directed him to go to the police department in Zaragoza to file a complaint, which he did. (Tr. I 36:17-37:20.) From there, Petitioner stated that the Zaragoza Police Department directed him to file a complaint with the Ministerio Del Interior ("Spanish Department of Homeland Security"). (*Id.*) On December 11, 2012, Petitioner filed a report with the Spanish Department of Homeland Security stating the children were wrongfully detained in the United States without his consent. (P-15.) Then, on or about December 22, 2012, Petitioner submitted a petition for the return of the children with the Spanish Central Authority. (P-16.) On October 3, 2013, Petitioner's Request for Return for the Children was submitted to the United States Department of State through the Spanish Central Authority. (P-17.) On or about July 10, 2014, Petitioner filed the Petition with this Court.

During the two years of living in the United States, the children have lived with Respondent at three different residences. Currently, Respondent rents two rooms from a couple she met after arriving in Trenton two years ago. (Tr. II 107:18-108:2.) The children share a bedroom on the same floor as the couple, and Respondent has a room in the basement. (*Id.* at 108:3-9.) Respondent and the children share a kitchen and bathroom with the couple. (*Id.*) Respondent has also held four different jobs while in the United States and is currently working at a factory making

6

approximately $450 per week.  (*Id.* at 106:14-20.)  Respondent does not have legal authority to work in the United States.  Both children have attended school in the United States for two years but do not participate in any extracurricular activities.  The only extended family the children have contact with in the United States is Petitioner's father in Massachusetts but have only visited him on two occasions, one of which was with Petitioner in November 2012.  Respondent and the children have overstayed their visas and are not able to travel outside of the United States to visit other extended family members or Petitioner, and the children do not have healthcare insurance. The children still remain in close contact, through the telephone and internet, with their grandmother and cousins in Spain.

The Court interviewed K.H. and G.H. separately *in camera*.  K.H. is fifteen years old and has just begun the tenth grade.  Previously K.H. was in English as a Second Language ("ESL") classes, but this year she was mainstreamed to regular classes and acknowledged many of her friends remain in ESL classes.  As might be expected given her physical separation from her father, K.H. is currently distant from him in an emotional sense as well.   When asked about her relationship with her father, K.H. said she did not know what to say and could only agree when asked if her relationship was good.  K.H. also stated that her mother had not permitted any contact between her and her father during this litigation but also stated that she felt she should not have to contact her father and he should be contacting her.  K.H. describes the relationship with her sister as close.

K.H. stated that she prefers to live in the United States but might have been okay with returning to Spain in November 2012 if her mother had returned with her and her sister.  When asked to explain why she wants to remain in the United States, K.H. could only state that she thought she would have more opportunities for a career in the United States and that if she returned

7

to Spain, her mother would stay in the United States. K.H. expressed aspirations to become an engineer or doctor and stated that a job and career were important to her. When asked, however, if she understood the limitations she might face due to her current immigration status, K.H. knew it would limit her ability to go to college and the jobs she would be able to perform. When asked what would be good about returning to Spain, K.H. stated she would be able to see her family again.

G.H. just turned twelve years old and is in the seventh grade. When asked what types of things she does in the United States with her mother, G.H. could only identify going to the mall and had to be prompted to identify more activities such as playing games. When asked about activities she did with her father in Spain, G.H. stated that they would go to the mall, go out to eat, go to the park with their dog, and go out to get ice cream. G.H. expressed that she has not been able to talk to her father much since she has been in the United States and that her father only talks to her mother when he calls. When asked directly, G.H. stated she wanted to remain in the United States but did not give any reasons for her choice.

## II.    CONCLUSIONS OF LAW

### A.    Jurisdiction

This Court's jurisdiction is premised on 42 U.S.C. § 11603(a), which provides that "[t]he courts of the States and the United States district courts shall have concurrent jurisdiction of actions arising under the Convention." 42 U.S.C. § 11603(a); *see also Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 270 (3d Cir. 2007). Spain and the United States are contracting states under the Convention. Accordingly, this Court has jurisdiction over this matter.

B.   **Hague Convention Overview**

The Hague Convention "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). The Convention's express objectives are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1. It is well settled that the Convention was not "designed to settle international custody disputes, but rather to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases." *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006) (citing *Baxter v. Baxter*, 423 F.3d 363, 367 (3d Cir. 2005)).

A person claiming that a child has been wrongfully removed to or retained in the United States can commence judicial proceedings under the Convention by filing a petition for the return of a child in a state or federal court that has jurisdiction where the child is located. 42 U.S.C. § 11603(b). In order for the petition to be granted, the petitioner must prove by a preponderance of the evidence that the removal or retention was wrongful. 42 U.S.C. § 11603(e)(1)(A). Under Article 3 of the Convention, the removal or retention of a child is "wrongful" where:

> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3. Further, "[a] petitioner cannot claim that the removal or retention of a child is 'wrongful' under the Hague Convention unless 'the child to whom the petition relates is 'habitually resident' in a State signatory to the Convention and has been removed to or retained in

a different state.'" *Karkkainen*, 445 F.3d at 287 (*quoting Gitter v. Gitter*, 396 F.3d 124, 130 (2d Cir. 2005)).

If the petitioner successfully makes out a *prima facie* case of wrongful removal or retention, the burden shifts to the respondent to establish one of the Convention's narrow defenses, and if the respondent fails to do so, the child must be returned. *Id.* Even where a defense is found to be applicable, the court need not allow the child to remain with the "abducting" parent if it appears that return would further the aims of the Convention. *Id.*

### C.   *Prima Facie* Case for Wrongful Removal or Retention

Third Circuit jurisprudence instructs that to determine a claim under Article 3 of the Convention, the Court should consider four issues:

    (1) when the removal or retention at issue occurred;

    (2) the country in which the child was habitually resident prior to the removal or retention;

    (3) whether the removal or retention breached the custody rights of the petitioner; and

    (4) whether the petitioner was exercising those custody rights at the time of the removal or retention.

*Baxter*, 423 F.3d at 368. The petitioner must establish a *prima facie* case of wrongful removal or retention by a preponderance of the evidence. 42 U.S.C. § 11603(e)(1)(A).

### 1.   *Date of Wrongful Removal or Retention*

The first step in the analysis is determining the actual date of the children's removal or retention "so as to establish the relevant date of [the children's] habitual residence for purposes of the Convention." *Karkkainen*, 445 F.3d at 290. Wrongful removal refers to the parent's physical taking of the child out of the country; wrongful retention refers to the parent's keeping the child out of the country. *Baxter*, 423 F.3d at 369. Thus, a parent may remove a child from the country

with permission but then wrongfully retain the child outside the country. *Id.* at 370-71.  The assertion in the instant matter is not that the children were wrongfully removed to the United States but that they were unlawfully retained here by Respondent.  In determining the date of a wrongful retention, the Third Circuit has agreed that "[t]he wrongful retention does not begin until the noncustodial parent . . . *clearly* communicates her desire to regain custody and asserts her parental right to have [her child] live with her." *Karkkainen*, 445 F.3d at 290 (alterations in original) (quoting *Slagenweit v. Slagenweit*, 841 F. Supp. 264, 270 (N.D. Iowa 1993)).

Here, the Court finds that the date of retention may have taken place sometime during October 2012, but began no later than November 9, 2012.  Petitioner testified that during October 2012 he contacted Respondent and Respondent told him that she intended to remain in the United States with the children permanently.  After the telephone call, Petitioner understood that Respondent did not intend to bring the children back to Spain, informed her that he did not consent to the children remaining in the United States, and planned a trip to the United States to bring the children back to Spain.  Neither party could identify a specific date of this conversation.  The date of retention, however, was by no means later than November 9, 2012, the date Respondent definitively knew that Petitioner intended to bring the children back to Spain with him and alerted the local authorities in Trenton.  Accordingly, for the purposes of this analysis the Court will apply November 9, 2012 as the measuring date for wrongful retention of K.H. and G.H.

### 2.  *Habitual Residence*

Having determined that November 9, 2012 is the measuring date of the children's wrongful retention, the Court must now determine the place of the children's habitual residence as of this date.  The Convention does not define habitual residence; however, the Third Circuit has defined it as "the place where [the child] has been physically present for an amount of time sufficient for

acclimatization and which has a degree of settled purpose from the child's perspective." *Yang*, 499 F.3d at 271. "The inquiry focuses on the child, but also must consider the parents' present, shared intentions regarding their child's presence [in a particular location]." *Id.* at 271-72 (internal citations omitted). Ultimately, the inquiry is "whether a child has made a country her home before the date of her removal or retention." *Id.*; *see also Whiting v. Krassner*, 391 F.3d 540, 550 (3d Cir. 2004).

In *Whiting*, the Third Circuit discussed the three broad categories of fact patterns that give rise to cases under the Hague Convention where habitual residence is an issue: (1) "the situation in which the court finds that the family as a unit has translocated and 'manifested a settled purpose to change its habitual residence, despite the fact that one parent may have had qualms about the move'"; (2) the situation in which the "petitioning parent initially agreed to allow the child to stay abroad for an indefinite duration"; and (3) the situation where "the child's initial move from an established habitual residence was clearly intended to be for a specific, limited duration." 391 F.3d at 549 (quoting *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001)). In this second category, the circumstances surrounding the child's stay may sometimes suggest that, despite the lack of perfect consensus, the parents intended the stay to be indefinite, leading to an abandonment of the prior habitual residence; however, the circumstances might instead suggest that there was no settled mutual intent to abandon the prior habitual residence. *See Mozes*, 239 F.3d at 1077. This case most closely resembles the second category. As the Third Circuit recognized, cases falling within that category "generally have no clear answer and are very fact-dependent." *Yang*, 499 F.3d at 271.

Here, the record indicates that K.H. and G.H. had only been in the United States for a little over a month when the wrongful retention occurred. The only record evidence regarding the month

12

at issue shows that Respondent enrolled the children in school, Respondent moved apartments, and Petitioner kept in contact with the children. K.H. also stated that if her mother had decided in November 2012 to return to Spain, she might have been okay with that decision. Based on this evidence, it cannot be said that K.H. and G.H. became "firmly rooted in [their] new surroundings." *Karkkainen*, 445 F.3d at 292. Furthermore, neither party argues that the children had acclimatized to the United States at the time of retention.

Looking to the parties' "shared intentions" as to the children's presence in the United States just prior to the wrongful retention, the Court finds neither parties' testimony completely credible. While Petitioner testified the children were only visiting for one month, he sent them with their school records at the beginning of the school year and did not have them start the school year in Spain prior to their departure for the United States. In contrast, Respondent testified that the plan was for the whole family to relocate to the United States, including Petitioner, but when asked what type of job Petitioner was going to hold in the United States, she responded the same job he has in Spain, bus driver, even though she then admitted he could not hold that job in the United States as he does not have a valid driver's license here. Additionally, there is no evidence that Respondent or Petitioner took any meaningful steps towards preparing to relocate the entire family permanently.

It is undeniable that Spain was the children's habitual residence before they traveled to the United States. As there was no shared mutual intent, on the part of the parties, for the children to abandon their prior residence and no evidence that the children were acclimatized to the United States prior to retention, the Court concludes that the children's habitual residence immediately prior to November 9, 2012, was Spain.

### 3. Whether Respondent's Retention of the Children Breached Petitioner's Custody Rights Under Spanish Law

Having decided that the children's habitual residence immediately before November 9, 2012, was Spain, the Court will now address whether Respondent's retention of K.H. and G.H. in the United States is in breach of Petitioner's custody rights under Spanish law. According to Petitioner, at the time of the children's retention in the United States, Petitioner had rights of custody as established by Spanish law, specifically under Articles 108, 154, 156, 159, and 160 of the Spanish Civil Code and Article 14 and 39 of the Spanish Constitution. Respondent does not argue that Petitioner had custody rights over K.H. and G.H. at the time of wrongful retention. Furthermore, pursuant to Spanish law:

> in any case, both breakup and not breakup [sic] of cohabitation situations, the decision to fix the place of residence of the minor, to change the minor's domicile, to move the minor to a different place from his habitual residence or move him abroad, always needs the consent of both parents and, failing this, the judicial authorization. The cessation of cohabitation among parents does not at all affect the inherent powers of both progenitors to exercise their parental rights which are usually shared in most cases by both parents.

(Pet'r's Br. 18-19, ECF No. 25; P-17.) Thus, under Spanish law, Petitioner had the right to exercise parental authority over K.H. and G.H. at the time of retention. Respondent's retention over the children in the United States against Petitioner's will violates Petitioner's right to exercise parental authority over K.H. and G.H. in accordance with the Spanish Civil Code and Spanish Constitution.

### 4. Whether Petitioner was Exercising His Custody Rights at the Time of Retention

The last hurdle Petitioner must overcome to establish that Respondent's retention of the children is wrongful under Article 3 of the Convention is to prove that he exercised his custody rights as of the retention date. This is an easy burden. The Third Circuit has held that "[v]ery little is required of the applicant in support of the allegation that custody rights have actually been or

14

would have been exercised. The applicant need only provide some preliminary evidence that he or she actually exercised custody of the child, for instance, took physical care of the child." *In re Application of Adan*, 437 F.3d 381, 391 (3d Cir. 2006) (citation omitted).

Here, from July 2012 through September 2012, Petitioner was the primary caregiver of the children while Respondent was in the United States. Additionally, Respondent acknowledged that Petitioner remained in contact with herself and the children during the first few weeks the children were in the United States. Respondent even testified that it was not until she informed Petitioner that she would not be returning the children to Spain that Petitioner would no longer talk to her and would only speak with the children. Additionally, once Petitioner learned that Respondent had no intention of returning the children to him in Spain, he devised a plan to return the children to Spain himself without informing Respondent, although not the most legally prudent course of action. In any event, once Petitioner was informed by the authorities in the United States he was not allowed to take the children with him back to Spain against Respondent's wishes, Petitioner began the legal process to have his children returned. These facts sufficiently establish that Petitioner was exercising his custody rights at the time of wrongful retention.

Because Respondent retained K.H. and G.H. outside of Spain – the children's place of habitual residence – in breach of Petitioner's custody rights under Spanish law, and because Petitioner was exercising his rights at the time of the wrongful retention, this Court holds that Petitioner has satisfied his *prima facie* burden of proving that K.H. and G.H. were wrongfully retained in the United States. Accordingly, the Court will consider whether Respondent has established any affirmative defenses.

**D.      Affirmative Defenses[4]**

Respondent has raised three affirmative defenses recognized by the Convention: (1) that Petitioner consented and acquiesced to the children's retention in the United States; (2) that proceedings were commenced more than one year after wrongful retention and the children are now "well settled" in the United States; and (3) that the children are at an age and degree of maturity at which it is appropriate to take account of their views, and both children stated they wanted to remain in the United States.[5] (Resp't's Br. 20-23, ECF No. 24.) Respondent bears the burden of proof by a preponderance of the evidence for each affirmative defense.  42 U.S.C. § 11603(e)(2)(A).  The court, however, "retain[s] the discretion to order return even if one of the exceptions is proven." *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995).

---

[4] Petitioner argues that Respondent should be precluded from raising any affirmative defenses since she did not raise any of the six enumerated affirmative defenses under the Convention in her Answer. (Pet'r's Br. 23-24, ECF No. 25.)  While a plaintiff must be given fair notice that a defense is being asserted through pleadings that give enough specificity and factual particularity to identify the defense pleaded, *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971), a technical failure to plead an affirmative defense does not destroy a respondent's ability to ever raise that defense. *Bernal v. Gonzalez*, 923 F. Supp. 2d 907, 923 (W.D. Tex. 2012) (holding that in the context of a Hague Convention case a respondent does not necessarily waive an affirmative defense even when not plead if it is raised at a pragmatically sufficient time so not to prejudice a petitioner).  Here, pro bono counsel was appointed to Respondent with limited time to file initial pleadings and prepare for an evidentiary hearing given the urgency of this matter.  Ms. Camacho was most diligent and provided exemplary efforts in this matter for her client.  Petitioner knew prior to the evidentiary hearing that Respondent would be raising affirmative defenses, and Petitioner was well aware of the potential of one or more of the six enumerated affirmative defenses being raised based on the facts of this case, the time the children have been in the United States, and the children's ages.  Thus, the Court will consider the three affirmative defenses raised by Respondent.

[5] Although there was some testimony during the two day evidentiary hearing regarding the alleged physical and mental abuse between Respondent and Petitioner, these isolated events never extended to the children.  (Tr. 2 31:6-18.)  Furthermore, such allegations of abuse between Petitioner and Respondent have no impact on Respondent's affirmative defenses.

### 1.  *Consent or Acquiescence Defense*

"Although analytically distinct, the defenses of consent and acquiescence under article 13(a) of the Hague Convention are both narrow." *Baxter*, 423 F.3d at 371 (citing 42 U.S.C. § 11601(a)(4)).  "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Id.* (citing *Gonzalez-Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001)).  In evaluating a consent defense, "it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside [his or her] home country. The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account." *Id.* at 371-72 (citations omitted).  Furthermore, "[t]he fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention." *Id.*  Likewise, to establish the defense of acquiescence, it has been held to require "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Id.*

Nothing in the record demonstrates that Petitioner consented to the children's permanent retention in the United States or to Respondent making unilateral decisions regarding the children's future, nor is there evidence that Petitioner acquiesced to the present arrangement.  While the Court has not found either party's testimony as to the scope and length of the children's visit to the United States completely credible, the evidence does not support Respondent's contention that the arrangement was permanent.  Moreover, since learning of Respondent's decision to retain K.H. and G.H. in the United States, Petitioner has objected and pursued his rights under the Convention.  Thus, the record demonstrates that Petitioner agreed to allow the children to visit the United States

for an indefinite period, but it is unclear that he agreed to anything beyond that. This intent falls short of the standard for finding consent or acquiescence under Article 13(a) of the Convention.

### 2. *Well Settled Defense*

Pursuant to Article 12, if the party opposing the return of the child can show by a preponderance of the evidence that (1) the proceedings under the Convention were commenced more than one year after the date of wrongful retention and (2) the child is settled in his or her new environment, the Court need not order the return of the child. Hague Convention, art. 12; 42 U.S.C. § 11603(e)(2)(B). "In determining whether the 'settled' exception applies, the Court should consider any relevant factor informative of the child's connection with his or her living environment." *Silvestri v. Oliva*, 403 F. Supp. 2d 378, 387-88 (D.N.J. 2005). "Those factors include 'the age of the child, the stability of the child's residence in the new environment, whether the child attends school or day care consistently, whether the child attends church regularly, the stability of the mother's employment or other means of support, whether the child has friends and relatives in the area, and to what extent the child has maintained any ties to the country of habitual residence.'" *Id.* (quoting *Koc v. Koc*, 181 F. Supp. 2d 136, 152 (E.D.N.Y. 2001)). The immigration status of the child is not "singularly dispositive," but the importance of this factor on settlement "will inevitably vary for innumerable reasons, including: the likelihood that the child will be able to acquire legal status or otherwise remain in the United States, the child's age, and the extent to which the child will be harmed by her inability to receive certain government benefits." *Lozano v. Alvarez*, 697 F.3d 41, 57 (2d Cir. 2012), *cert. granted in part*, 133 S. Ct. 2851 (2013), *aff'd sub nom.*, 134 S. Ct. 1224 (2014).

The Court finds that K.H. and G.H. are not sufficiently settled here. The children arrived in New Jersey two years ago and have lived in three different residences, and currently share an

apartment with strangers Respondent has only known for a short period of time. The children are not involved in any extracurricular activities, and the only family they have, outside their mother, is a paternal grandfather they have only seen twice. Furthermore, Respondent's employment is not settled as she testified to having at least four different jobs since her arrival, some with hours in the middle of the night. Respondent testified that she currently works at a factory and earns approximately $450 per week but does not have the legal authority to work in the United States. Finally, while not a dispositive factor, the immigration status of Respondent and the children is a factor that disfavors finding the children settled in their new environment. Respondent and the children originally travelled to the United States on a tourist visa that expired in October 2012 and December 2012, respectively. Respondent has not applied for residency or any other visa on behalf of herself or her children. All three are currently here illegally and thus subject to deportation at any time. While there is no evidence that deportation is imminent or, indeed, may ever occur, K.H. even identified her immigration status as an issue for her in seeking higher education and eventually a career in the United States. Both children have remained in close contact with their extended family in Spain, particularly their grandmother and cousins, through the telephone and internet. Considering these various factors, the Court finds that Respondent has not proven that K.H. and G.H. have settled in their new environment.

### 3. *Wishes of the Children Defense*

Article 13 includes what has been called the "wishes of the child" defense or exception. The Convention provides:

> The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [his or her] views.

Hague Convention, art. 13. "As with any of the affirmative defenses under the Convention, this defense is to be construed narrowly. The exceptions are construed narrowly so their application does not undermine the express purposes of the Convention." *Yang*, 499 F.3d at 278 (internal citations omitted). Additionally, "even if the respondent meets his or her burden of proving the affirmative defense, the court retains the discretion to order the return of the child if it would further the aim of the Convention which is to provide for the return of a wrongfully removed child." *Id.*

While "[t]he child's wishes can be the sole reason that a court refuses to order the return of the child to his or her habitual residence. . . . a 'court must apply a stricter standard in considering a child's wishes when those wishes are the sole reason underlying a repatriation decision and not part of some broader analysis,' such as whether the child would suffer a grave risk of harm if returned to his or her habitual residence." *Id.* at 278-79 (citing *de Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007)). In analyzing whether to apply the "wishes of the child" exception a court should consider: "whether the child is of sufficient age and maturity for his or her views to be taken into account" and "whether a child's desire to remain or return to a place is the product of undue influence." *Id.*

Here the children are fifteen years old and twelve years old and have been in the United States for just over two years. Both children were informally questioned in the presence of counsel but not the parties. The children are doing well in school and can speak English. Neither child is involved in any extracurricular activities, nor are the children in the United States legally. Both children expressed the view that they would prefer to remain in the United States, but only K.H. provided reasons for her preference. K.H. expressed that she believed there were better opportunities for her in the United States than Spain and mentioned that she did not believe her

mother would return to Spain if she was sent back there. K.H. acknowledged that her job opportunities and her life in the United States in general are more limited than in Spain because of her immigration status. Both children reported to have contact with their extended family members in Spain and acknowledged the only family they had in the United States was their mother and their paternal grandfather, who they have only seen twice. The Court finds that K.H. has reached an age of maturity at which it is appropriate to take account of her views. This is arguably a closer question for her sister, G.H., but the Court will assume for purposes of discussion that she likewise has reached a sufficient age and maturity for the Article 13 provision to apply.

Even though this Court respects the views and concerns of K.H. and G.H., the circumstances do not warrant providing their views controlling weight. The children have been in the United States for two years and just began a new school year here. It is understandable and predictable that they have a far closer connection with their mother, with whom they have lived for this extended period, than with their father. But all of this is, at least in significant part, a direct result of their wrongful retention here by Respondent. As the Third Circuit noted, "[a] lengthy wrongful retention could enable the child to become comfortable in his or her new surroundings, which may create a desire to remain in his or her new home." *Yang*, 499 F.3d at 280. In such a case, "application of the exception . . . would reward [a respondent] for violating [a petitioner's] custody rights, and defeat the purposes of the Convention." *Id.*

### E.    Other Relief Requested in the Petition

In addition to requesting that this Court order K.H. and G.H.'s return to Spain, Petitioner seeks Petitioner's expenses and costs, including attorney's fees and transportation costs, pursuant to 42 U.S.C. § 11607. Pursuant to Article 26 of the Convention and 42 U.S.C. § 11607(b)(3), any court that orders the return of a child under the Convention:

21

> shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

42 U.S.C. § 11607(b)(3). The Court has already determined that the assignment of pro bono counsel to Respondent is appropriate due to Respondent's financial circumstances and inability to pay. Thus, an award of expenses and costs would be "clearly inappropriate." Accordingly, Petitioner's request for expenses and costs is denied.

## III.   CONCLUSION

For the foregoing reasons, this Court holds that Petitioner has satisfied his burden of proving by a preponderance of the evidence that Respondent has wrongfully retained K.H. and G.H. in the United States in violation of the Convention. Because Respondent has failed to establish an affirmative defense, K.H. and G.H. must return to Spain. An appropriate Order follows this Opinion.

**Michael A. Shipp**
**United States District Judge**

**Dated:** October 3, 2014